**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Patricia M. Weinert, | : | Case No. 3:10-CV-01655 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND** |
| | | **RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her claims for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act), 42 U. S. C. §§ 1381 *et seq,* and Disability Insurance Benefits (DIB) under Title II of, 42 U. S. C. §§ 416 (i) and 423.  Pending are the parties' briefs on the merits (Docket No. 19 and 24) and reply brief (Docket No. 25).  For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision.

**I. PROCEDURAL BACKGROUND**

Plaintiff filed applications for SSI and DIB on June 8, 2007, alleging that her disability began on March 15, 2005 (Docket No. 17, Exhibit 7, pp. 2-3; 12-13 of 15).  Plaintiff's request for SSI benefits was denied initially and upon reconsideration (Docket No. 17, Exhibit 6, pp. 3-5; 6-8

of 17).  Plaintiff, represented by counsel, and Vocational Expert (VE) Joseph Thompson appeared and testified at an administrative hearing before Administrative Law Judge (ALJ) Eileen Burlison (Docket No. 17, Exhibit 2, p. 16 of 24).   The ALJ rendered an unfavorable decision on June 7, 2009 (Docket No. 17, Exhibit 2, pp. 16-24 of 24).  The Appeals Council denied Plaintiff's request for review on June 18, 2010 (Docket No. 17, Exhibit 2 , pp. 2-4 of 24).  Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.

## II.  FACTUAL BACKGROUND

**1. PLAINTIFF'S TESTIMONY.**

On May 6, 2009, Plaintiff was 26 years of age.  She completed the tenth grade,  later acquired a general equivalency degree (GED) and is currently enrolled at Lourdes College (Docket No. 17, Exhibit 3, pp. 8, 31, 32 of 44). Plaintiff lived alone in an apartment, and her five year-old son resided with his father.   During her son's weekly visitation with her, they stayed at her mother's home where Plaintiff felt more comfortable  (Docket No. 17, Exhibit 3, pp. 11-12, 25-27 of 44).

Plaintiff had never held a job for more than a "few months" (Docket No. 17, Exhibit 3, p. 10 of 44 ).  The last time she worked was two years earlier as a waitress in a pizza restaurant.  She quit after one and a half months of work because she felt exhausted, and she had difficulty concentrating and dealing with people (Docket No. 17, Exhibit 3, p. 9 of 44).  Plaintiff's position as a telemarketer for Ever Dry Waterproofing was eliminated (Docket No. 17, Exhibit 3, p. 9-10 of 44).

Plaintiff took care of her own personal needs, did her laundry, shopped for food and assisted her mother with housecleaning (Docket No. 17, Exhibit 3, pp. 12-13, 24 of 44).  Plaintiff's mother prepared her meals and assisted her with transportation; however, Plaintiff typically used public transportation.

2

As entertainment, Plaintiff watched television.  She did not socialize.  In fact, physical symptoms such as head jerks and body shakes occurred when she was around people (Docket No. 17, Exhibit 3, p. 13, 28 of 44).  Plaintiff claimed that she could stand "okay" and that she could carry a couple of grocery bags (Docket No. 17, Exhibit 3, p. 21 of 44).  Prolonged sitting resulted in pain that radiated from her hips to the bottom of her back (Docket No. 17, Exhibit 3, p. 20).

For the past fifteen years, Plaintiff had been diagnosed and treated for generalized anxiety disorder (GAD), a disorder that is characterized by chronic anxiety, exaggerated worry and tension, even when there is little or nothing to provoke it (Docket No. 17, Exhibit 3, p. 27 of 44; www.nimh.nih.gov).  Dr. Nick Piaza, a psychiatrist, saw her monthly (Docket No. 17, Exhibit 3, p. 15 of 44).  Once she had a severe panic attack for which she sought emergency medical treatment (Docket No. 17, Exhibit 3, pp. 18-19 of 44).  Now, Plaintiff took Ativan "just in case of extra panic attacks" (Docket No. 17, Exhibit 3, p. 23).  Nevertheless, Plaintiff sustained daily but brief panic attacks brought on by movement and participation in daily activities (Docket No. 17, Exhibit 3, pp. 22-23 of 44).  The symptoms included shakiness in her chest, dyspnea and palpitations (Docket No. 17, Exhibit 3, pp. 22-24 of 44).  Chronic diarrhea was a side effect of the medication taken to moderate her mental health issues (Docket No. 17, Exhibit 3, p. 22 of 44).  Plaintiff also suffered from sleep disturbances so she was typically exhausted during the day (Docket No. 17, Exhibit 3, pp. 23-24 of 44). She was undergoing treatment for a right leg injury which resulted in leg spasms (Docket No. 17, Exhibit 3, pp. 16-17 of 44).

### 2.  VE Testimony

The VE testified that a younger person with a high school education by virtue of a GED, with little to no past relevant skill who could perform work only at light exertional levels, with the inability to operate dangerous moving machinery, with no climbing or working at heights and

3

dealing with the public in only brief and superficial ways, could perform Plaintiff's past relevant work of drycleaner attendant, bagger, cashier and the fast food worker (Docket No. 17, Exhibit 3, pp. 33-35 of 44). In addition, there were other jobs in the national or regional economy that this hypothetical worker could perform:

| MEDIUM, UNSKILLED JOB | NATIONAL AVAILABILITY |
|---|---|
| ASSEMBLER | 450,000 |
| DISHWASHER | 225,000 |
| PACKAGER | 360,000 |

(Docket No. 17, Exhibit 3, p. 34 of 44).

| LIGHT, UNSKILLED JOB | NATIONAL AVAILABILITY |
|---|---|
| Assembler | 1,200,000 |
| Packager | 360,000 |
| Folder | 120,000 |

(Docket No. 17, Exhibit 3, pp. 34-35 of 44).

The VE added that if the hypothetical worker could not briefly meet with the public, then it would eliminate the fast food cashier job (Docket No. 17, Exhibit 3, p. 35). The VE also mentioned that if the hypothetical worker could not get to work on time, or required several unscheduled break periods, then disciplinary action would be likely in any job taken by the hypothetical worker (Docket No. 17, Exhibit 3, p. 36). The employment would be eliminated if any of the following functional impairments existed:

(1)   No useful ability to function in responding appropriately to changes in work.
(2)   Unable to complete a normal workday and work week without interruptions from psychologically based symptoms.
(3)   No useful ability to function in dealing with normal work stress.

4

(Docket No. 17, Exhibit 3, p. 37-38 of 44).

If the following conditions co-existed, the VE testified that even unskilled work would be eliminated and possible employment for the hypothetical worker would be eliminated:

(1)     Unable to maintain attention for a two hour segment of time; and
(2)     Unable to meet competitive standards in understanding and remembering very short and simple instructions.

(Docket No. 17, p. 38 of 44).

### III.  SUMMARY OF MEDICAL EVIDENCE

On August 19, 2004, Plaintiff was admitted to St. Vincent Mercy Medical Center Emergency Room after being kidnapped and sexually assaulted the night before.  In addition to the sexual assault, Plaintiff suffered multiple contusions and abrasions (Docket No. 17, Exhibit 11, pp. 3-16 of 16).  Plaintiff reports that her symptoms of mental illness were exacerbated by being a victim of kidnapping and sexual assault. (Docket No. 19, p. 2 of 20).

### 1.  DR. JEROME ZAKE, PH. D., PSYCHOLOGIST.

Dr. Zake conducted a clinical interview on August 9, 2007, after which he noted that Plaintiff expressed several anxious symptoms including inability to breath and severe chest pain that occurred occasionally throughout the day.  He concluded that Plaintiff's presenting problems centered around symptoms of GAD as well as panic disorder with agoraphobia.  He diagnosed her with some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  He also concluded that her ability to work with others was extremely impaired due to trouble communicating and anxiety. Plaintiff's ability to maintain attention to simple tasks was moderately impaired and her ability to

5

withstand the stress of day to day work was extremely impaired (Docket No. 17, Exhibit 14, pp. 7-8 of 25).

### 2. DR. JENNIFER SWAIN, PSY.D., PSYCHOLOGIST

Dr. Swain examined Plaintiff's file on August 31, 2007 and completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique Form. The assessment was reviewed and affirmed as written by Dr. Bruce Goldsmith, Ph. D., on December 20, 2007 (Docket No. 17, Exhibit 15, p. 23 of 34).

Dr. Swain evaluated Plaintiff's capacity to sustain normal workdays and noted several areas that were moderately limited including concentration capacities, social interactions, and the ability to respond to changes in work setting. Dr. Swain's review of files relied substantially upon Dr. Zake's findings, but Dr. Swain noted limitations and deviations from his conclusions. Consequently, Dr. Swain concluded that Plaintiff exhibited anxiety symptoms, but she was capable of routine work without strict production requirements and work with a structured setting with few distractions. Dr. Swain agreed with Dr. Zake with regard to the diagnoses of dysthymia and GAD with agoraphobia. Dr. Swain concluded that Plaintiff had moderate limitations in the ability to: carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with or proximity to others and complete a normal work week or work day without interruptions (Docket No. 17, Exhibit 14, pp. 9-10 of 25).

Dr. Swain reiterated that Plaintiff had medically determinable impairments that did not satisfy the diagnostic criteria, namely, dysthymia, GAD and panic disorder with agoraphobia. In assessing Plaintiff's functional limitations, Dr. Swain found that Plaintiff had a mild degree of functional limitations in activities of daily living and moderate functional limitations in her ability to maintain social functioning and maintaining concentration, persistence and pace. Dr. Swain

6

noted that some 'B' criteria was met, but that no 'C' criteria was met and therefore Plaintiff was not functionally limited from work (Docket No. 17, Exhibit 14, pp. 13-25 of 25).

### 3. CAROLE FRANCES KRISTON-DEPEW, LICENSED CLINICAL SOCIAL WORKER

On September 19, 2007, Ms. Kriston-Depew completed an Adult Diagnostic Assessment in which she acknowledged that Plaintiff had a major depressive disorder, recurrent, severe with psychotic features, post traumatic stress disorder (PTSD), chronic, panic disorder with agoraphobia and serious symptoms or any serious impairment in social, occupational, or school functioning. Ms. Kriston-Depew noted that Plaintiff suffered from mental symptoms such as withdrawal, social incompetence, excessive suspiciousness of others, excessive anxiety and worry, avoidance, psychic pain, chronic worry and negativity. She also noted several physical symptoms as a result of Plaintiff's mental health issues including insomnia, loss of energy, sense of hopelessness and helplessness, loss of appetite, and hyper-arousal (Docket No. 17, Exhibit 15, pp. 2-15 of 34).

### 4. DR. MAITHRY UDDARAJU, M. D., FAMILY PRACTITIONER.

On September 10, 2007, Dr. Uddaraju commenced treating Plaintiff for several panic episodes that started in 2004 (Docket No. 17, Exhibit 15, pp. 21-22 of 34). On November 1, 2007, Dr. Uddaraju diagnosed Plaintiff with GAD, for which she prescribed Lexapro and suggested that Plaintiff continue counseling at Harbor Mental Health Center (Docket No. 17, Exhibit 15, p. 20 of 34).

Throughout 2008, Dr. Uddaraju changed Plaintiff's medication frequently trying unsuccessfully to find combinations that would alleviate her symptoms (Docket No. 17, Exhibit 16, pp. 2-20 of 22). Dr. Uddaraju ordered magnetic resonance imaging (MRI) testing. Administered on July 29, 2008, the test results showed no evidence of soft tissue mass or fluid collection in the area of clinical symptoms. Additionally, there were minimal changes of tendinosis within the

rectus femoris with no evidence of a tear (Docket No. 17, Exhibit 16, pp. 21-22 of 22).   On September 18, 2008, Dr. Uddaraju concluded that the muscle relaxants were not helpful in the treatment of tendinosis of the right rectus femoris muscle.   Continued physical therapy was recommended (Docket No. 17, Exhibit 16, p. 3 of 22). On October 13, 2008, Dr. Uddaraju changed Plaintiff's medication noting that Plaintiff had shown improvement on Paxil (Docket No. 17, Exhibit 15, pp. 29-34 of 34).

In evaluating her work potential, Dr. Uddaraju noted that Plaintiff lacked the mental ability and aptitude needed to meet the competitive standards of employment in the areas of understanding and remembering very short and simple instructions, understanding and remembering detailed instructions, interacting appropriately with the general public and carrying out detailed instructions (Docket No. 17, Exhibit 15, pp. 29-32 of 34).   Dr. Uddaraju concluded that Plaintiff's anxiety disorder represented a complete inability to function independently outside the area of her home, that Plaintiff's impairment would cause her to be absent from work more than four days per month and that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations (Docket No. 17, Exhibit 15, p. 34 of 34).

On November 17, 2008, Plaintiff advised Dr. Uddaraju that her panic attacks were "letting up" and that her right thigh problems were her main issue now (Docket No. 17, Exhibit 17, p. 14 of 25).   On November 25, 2008, Plaintiff complained of right thigh pain and associated signs and symptoms such as burning, itching and tenderness.   Dr. Uddaraju reviewed the treatment plan and ordered that Plaintiff continue home progressive resistive exercise (Docket No. 17, Exhibit 17, pp. 18-20 of 25).

On February 16, 2009, Plaintiff presented with low back pain, neck pain and right mid distal thigh tenderness.  Medication to reduce severe pain and continued progressive resistive therapy were prescribed (Docket No. 17, Exhibit 17, p. 23 of 25).

On April 7, 2009, Dr. Uddaraju commented that Plaintiff had PTSD as well as depression so the dosage of Paxil was increased.  Plaintiff was sleeping better but she still complained of racing heart and chest tightness.  Dr. Uddaraju prescribed a topical ointment for treatment of a rash and a pain reliever for thigh pain (Docket No. 17, Exhibit 17, pp. 24-25 of 25).

### 5. DR. CHANDAN NAYAK, M.D., PSYCHIATRIST.

Dr. Nayak performed a psychological examination of Plaintiff on January 8, 2008.  She described Plaintiff as agitated, anxious, resistant, and with a constricted affect.  Dr. Nayak prescribed medications to relieve depression and anxiety (Docket No. 17, Exhibit 15, pp. 24-28 of 34).

### 6. FLOWER HOSPITAL

Plaintiff presented to the Emergency Room at Flower Hospital on March 20, 2005.  Results from the x-ray examination of Plaintiff's abdomen were negative (Docket No. 17, Exhibit 12, p. 22 of 25).

Plaintiff reported complaints of left shoulder pain on April 4 and April 8, 2006.  On April 4, Plaintiff was diagnosed with tenderness and spasm on the left rhomboid muscles and left latissimus dorsi muscles.  She was encouraged to apply warm compresses.  On April 8, the attending physician prescribed a pain reliever (Docket No. 17, Exhibit 12, pp. 12-16 of 25).

Plaintiff presented to the hospital on January 13, 2007, with hyperventilation/anxiety attack.  She was prescribed Ativan (Docket No. 17, Exhibit 12, pp. 9-10 of 25; Exhibit 13, pp. 21-34 of 34).

Plaintiff reported to Flower Hospital on June 4, 2007, with difficulty breathing/panic attack. No x-ray abnormality of Plaintiff's chest was identified.  Plaintiff was prescribed Xanax (Docket No. 17, Exhibit 12, pp. 3, 5; Exhibit 13, pp. 5-20 of 34).

### 7. SPORTS CARE REHABILITATION.

Dr. Uddaraju referred Plaintiff for therapy and from August 5, 2008 through September 19, 2008, Plaintiff and a therapist attempted to increase Plaintiff's flexibility and decrease her pain. Plaintiff's rehabilitation prognosis was excellent (Docket No. 17, Exhibit 17, p. 3- 12 of 25).

### IV.  STANDARD OF DISABILITY

SSI is available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A); *See also* 20 C.F.R. § 416.905(a) (definition used in the SSI context)).

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

10

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## V.  THE ALJ'S FINDINGS

On June 30, 2009, the ALJ applied the governing five step analyses and determined that Plaintiff was not disabled.  At step one, the ALJ found that Plaintiff had engaged in no substantial work activity after June 7, 2007 as defined by 20 C.F.R. § 404.1572.

At step two, the ALJ found that Plaintiff had the following severe impairments:  GAD, depression, PTSD, and tendinosis of the right thigh.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525 and 404.1526).  While noting the conditions as severe, the ALJ held that they were not disabling per se because they did not satisfy requirements of Section 12.04, affective disorders and 12.06, anxiety related disorders.  The ALJ found that the medical evidence as prepared by the state agency did not support or combine to meet the 'B' and 'C' criteria necessary to function as a listed impairment.

At step four, the ALJ found that Plaintiff had no past relevant work, and therefore her limitations were not preventing her from her past relevant work.

At step five, the ALJ found that Plaintiff has the capacity to perform medium work, excepting work around hazards such as climbing or dangerous machinery, while being limited to simple, routine work involving no more than brief and superficial contact with the general public. Based upon testimony from the VE, the ALJ found that work that Plaintiff could perform exists in significant numbers in the national economy.  Concluding his step five findings, the ALJ held that Plaintiff was not under a disability, as defined in the Act, at any time from June 7, 2007, through the date of decision or June 30, 2009 (Docket No. 17, Exhibit 2, pp. 16-24 of 24).

## VI.  STANDARD OF REVIEW.

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).  When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.*"  Johnson v. Astrue,* 2010 WL 5559542, *3 (N. D. Ohio 2010) (*citing Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  The reviewing court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility.  *Id.* (*citing Walters*, *supra*, 127 F.3d at 528).

If the ALJ applied the correct legal standards and his or her findings are supported by substantial evidence in the record, his or her decision is conclusive and must be affirmed.  *Id.* (*citing Warner v. Commissioner of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971) (*citing Consolidated Edison v. NLRB*, 59 S. Ct. 206, 217 (1938)). The substantial evidence standard is intended to create a "zone of choice within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, it is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have decided the case differently. *Id.* (*citing Crisp v. Secretary of Health & Human Services,* 790 F.2d 450, 453 n. 4 (6th Cir. 1986)).

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. *Id.* (*see Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) ("Although substantial evidence otherwise supports the decision of the Commissioner in this case, reversal is required because the agency failed to follow its own procedural regulation, and the regulation was intended to protect applicants like [plaintiff]."); *Id.* at 546 ("The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . .without observance of procedure required by law.' ") (*quoting* 5 U.S.C. § 706(2)(d) (2001)); *cf. Rogers*, 486 F.3d at 243 (holding that an ALJ's failure to follow a regulatory procedural requirement actually "denotes a lack of substantial evidence, even when the conclusion of the ALJ may be justified based upon the record"). "It is an elemental principal of administrative law that agencies are bound to follow their own regulations," *Id.* (*citing Wilson*, *supra*, 378 F.3d at

13

545, and the Court therefore "cannot excuse the denial of a mandatory procedural protection . . . simply because there is sufficient evidence in the record" to support the Commissioner's ultimate disability determination.  *Id.* (*citing Wilson*, *supra*, 378 F. 3d at 546).  The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless.  *Id.* (*see Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) (finding that a party seeking to overturn an agency's administrative decision normally bears the burden of showing that an error was harmful)).

An ALJ's violation of the SSA's procedural rules is harmless and "will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses."  *Id.* at *4 (*citing Wilson*, *supra*, 378 F.3d at 546-47 (emphasis added) (*quoting Connor v. United States Civil Services Commissioner*, 721 F.2d 1054, 1056 (6th Cir. 1983)).  Thus, an ALJ's procedural error is harmless if his or her ultimate decision is supported by substantial evidence and the error did not deprive the claimant of an important benefit or safeguard.  *Id.* (*see Wilson, supra*, 378 F. 3d at 547 (holding that an ALJ's violation of the rules for evaluating the opinion of a treating medical source outlined in 20 C.F.R. § 404.1527(d) was a deprivation of an "important procedural safeguard" and therefore not a harmless error).  If a procedural error is not harmless, then it warrants reversing and remanding the Commissioner's disability determination.  *Id.* (*citing Blakley*, *supra*, 581 F.3d at 409) (stating that a procedural error, notwithstanding the existence of substantial evidence to support the ALJ's ultimate decision, requires that a reviewing court "reverse and remand unless the error is a harmless de minimis procedural violation").

**VII. PLAINTIFF'S POSITION**

Plaintiff contends that the case should be reversed and remanded awarding a period of disability beginning on June 7, 2007.  There are four alleged assignments of errors:

First, the ALJ did not follow the procedure when he failed to give controlling weight to the reports of Dr. Uddaraju or give good reasons for failing to do so.  Also, Plaintiff alleges insufficient weight was given to the opinions of Dr. Zake, Mrs. Kriston-Depew and Dr. Nayak.

Second, the ALJ's hypothetical to the VE failed to portray Plaintiff's mental limitations.

Third, the ALJ improperly dismissed Plaintiff's statements as not credible.

Fourth, certain ALJ findings of fact are not supported by substantial evidence.

## VIII.  DEFENDANT'S POSITION

Defendant contends that the ALJ gave proper weight to the medical source opinions including the opinions of Drs. Uddaraju, Dr. Zake, Mrs. Kriston-Depew, and Dr. Nayak. They also contend that there existed substantial evidence to support the ALJ's finding on credibility, the hypothetical question, and findings of fact.  The Commissioner's decision and the denial of benefits should be affirmed.

## IX. ANALYSIS

The Magistrate finds that the ALJ:  followed the procedural requirements for assessing the opinions of a treating source and the state medical consultant;  properly posed the hypothetical and properly assessed Plaintiff's credibility.   Accordingly, the Commissioner's decision must be affirmed.

### 1.  SUFFICIENT WEIGHT WAS GIVEN TO MEDICAL EXPERTS

Plaintiff alleges that the ALJ erred in failing to give controlling weight to Dr. Uddaraju's opinions.  Plaintiff also alleges that sufficient weight was not given to the other medical evidence that she presented.

When assessing the medical evidence supporting a claim for disability benefits, the ALJ must adhere to certain standards. *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009). One such standard, known as the treating physician rule, requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* (*citing Wilson, supra*, 378 F.3d at 544) (*quoting* 20 C.F.R. § 404.1527(d)(2)). The ALJ "must" give a treating source opinion controlling weight if the treating source opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Id.* (*citing Wilson*, 378 F.3d at 544 (*quoting* 20 C.F.R. § 404.1527(d)(2)).

Conversely, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record." *Id.* (*citing* SOC. SEC. RUL. 96-2p, 1996 WL 374188, at *2 (July 2, 1996)). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Id.* (*citing Wilson,* 378 F.3d at 544; see also 20 C.F.R. § 404.1527(d)(2)).

16

Closely associated with the treating physician rule, the regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the claimant's treating source's opinion. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* at 406-407 (*citing* SOC. SEC. RUL. 96-2p, 1996 WL 374188, at *5). This procedural requirement exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has indicated that he or she is disabled and then an administrative agency decision is rendered indicating that he or she is not disabled. *Id.* (*citing Snell v. Apfel,* 177 F.3d 128, 134 (2nd Cir. 1999)). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Id.* (*citing Wilson*, 378 F.3d at 544).

Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," we have held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given " denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (*citing Rogers, supra*, 486 F.3d at 243 (emphasis added). In appropriate circumstances, the opinions of state agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS, SSR 96-6p, 1996 WL 374180, *3 (July 2, 1996).

In the instant case, the ALJ considered Dr. Uddaraju a treating physician.  She further considered the opinion evidence provided by Dr. Uddaraju for treatment for GAD, tendinosis in Plaintiff's right leg and improvement with regard to panic attacks and leg pain.  Dr. Uddaraju concluded that Plaintiff was disabled, and that Plaintiff could not work.  However, the ALJ found Dr. Uddaraju's questionnaire conclusory and against the weight of the record as a whole.  Specifically, the results in the questionnaire were not supported by the medically acceptable signs, symptoms, and laboratory findings (Docket No. 17, Exhibit 2, p. 22 of 24).  The ALJ made it clear that she gave "little evidentiary weight" to Dr. Uddaraju's questionnaire finding that Plaintiff was disabled.

In addition, Plaintiff alleges that the ALJ did not consider specific facts and notes made by Dr. Uddaraju before discounting them.  The ALJ did make a finding supported by substantial evidence that was specifically mentioned in her decision.  She included the lack of medical support, objective or subjective findings to support a 'disabled' finding, and recognized that Dr. Uddaraju made reference to improvement with treatment.  Plaintiff merely disagrees with the finding of the ALJ, but she has not overcome the standard of review required for reversal.

Plaintiff also alleges that the ALJ failed to weigh and consider the opinions of the other non-treating physicians who testified that Plaintiff was disabled.  The ALJ correctly explained in the decision the weight given to Dr. Swain's opinions related to Plaintiff's limitations.  With regard to Dr. Zake, there was specific mention of him in the ALJ's findings, which is strong evidence that his medical opinion was considered.  The ALJ considered Mrs. Kriston-Depew's evidence in assessing the conditions of limitations but she did not consider Mrs. Kriston-Depew's evidence in determining whether Plaintiff was disabled.

As for Dr. Nayak, there is no direct evidence that his evidence was weighed in making the final decision.  Dr. Nayak's medical records indicate that an initial psychiatric evaluation was conducted on January 8, 2008, for sixty minutes.  During this single session, Dr. Nayak made some general observations of Plaintiff's physical appearance and demeanor and documented Plaintiff's subjective complaints and past psychiatric history.  New medication was prescribed.  Because of its nature, little weight could have been attributed to Dr. Nayak's evaluation.  Although the ALJ did not specifically mention Dr. Nayak, no error was committed  by not explaining the omission of Dr. Nayak from the decision.

Having considered all relevant medical evidence involved in finding Plaintiff not disabled, the Magistrate finds that the ALJ gave sufficient consideration and weight to the medical evidence that was supported by objective medical evidence.

### 2.   THE HYPOTHETICAL SUFFICIENTLY DESCRIBED PLAINTIFF'S LIMITATIONS.

Plaintiff next alleges that the ALJ described a hypothetical worker whose limitations did not match those of Plaintiff as defined by either the state or non-state agency physicians.

The ALJ's hypothetical presented to the VE states that the hypothetical worker could work at medium exertion, but could not be exposed to any climbing or heights.  As non-exertional limitations, the ALJ decided that the hypothetical claimant could do simple and routine work that did not require more than brief and superficial contact with the public in general.  The ALJ had already given controlling weight to the state agency physician by step five; consequently, the hypothetical given to the VE conformed to the limitations included in the state agency physicians' descriptions.  Dr. Swain wrote that Plaintiff "is capable of simple routine work in a setting without strict production requirements, where duties are relatively static.  She can interact appropriately on a superficial level with familiar others, and would likely perform best in a smaller, non-public

19

setting"(Docket No. 17, Exhibit 14, p. 12 of 25).  The ALJ's hypothetical to the VE followed the finding of Dr. Swain, even though it did not follow the recommendation as to where Plaintiff would 'likely perform best'.

Plaintiff alleges that the ALJ hypothetical neglected her moderate limitations in concentration, persistence, pace, social functioning, and adapting to changes.  However, the ALJ need not list every medical condition the plaintiff has when reciting the hypothetical, only his or her limitations.  *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001).  The Magistrate finds that by describing the work as simple, routine work, Plaintiff's limitations in concentration, adapting to changes, and persistence were covered.  The ALJ further restricted her to limited and brief interactions with the public, making clear the ALJ considered Dr. Swain's restriction in social functioning.  Therefore, the ALJ sufficiently considered the medical evidence in Plaintiff's limitations when she presented the hypothetical to the VE.

### 3.  PLAINTIFF'S CREDIBILITY WAS SUFFICIENTLY CONSIDERED BY THE ALJ

Plaintiff also alleges that the ALJ did not consider her credibility with regard to her ability to complete everyday activities and focused instead on irrelevant activities that Plaintiff could complete.

The ALJ, not the reviewing court, has the responsibility to evaluate the credibility of witnesses, including that of the claimant.  *Rogers, supra*, 486 F.3d at 247 (*citing Walters, supra*, 127 F.3d at 531 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 538 (6th Cir. 1981)).  However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility."  *Id.* (*citing* SSR 96-7p, 1996 WL 374186, at * 4).  Rather, such determinations must find support in the record.  *Id.*  Whenever a claimant's complaints regarding

symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.*

The entire case record includes any medical signs and laboratory findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency of the various pieces of information contained in the record should be scrutinized. *Id.* at 247-248. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

An ALJ must explain his or her credibility determinations in his or her decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7p (July 2, 1996). In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Rogers*, *supra*, 486 F. 3d at 248.

The Magistrate finds that the ALJ complied with the requirement that she fully explain determinations of credibility. In fact, she explained at length, her consideration of the subjective evidence. The ALJ referred to Plaintiff's testimony in her decision, and discounted it noting that "claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely plausible to the extent alleged." In recognizing Plaintiff's claim, the ALJ met the

21

procedural burden of considering Plaintiff's testimony along with the medical evidence presented. The Court must give deference to the ALJ's decision as support for it can be found in the record. .

### 4.  THE ALJ FINDINGS WERE SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff finally alleges that the ALJ failed to account for her panic disorder with agoraphobia as a severe impairment.  While it is true that the ALJ makes no specific mention of agoraphobia, the ALJ mentioned panic and anxiety and acknowledged that Plaintiff should only have brief interactions with the public.  It is clear that this symptom was accounted for in the ALJ's decision.  There was no harm created by the omission of that term as it applies to the description of symptoms that Plaintiff was experiencing since the ALJ considered it as a basis for the finding of Plaintiff's residual functional capacity.

### X.  CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the Magistrate.


/s/Vernelis K. Armstrong
United States Magistrate Judge

Dated: July 19, 2011

### XI.  NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate

Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.